[No. D003662. Fourth Dist., Div. One. Feb. 20, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH S. BROOKS, Defendant and Appellant.

[No. D004996. Fourth Dist., Div. One. Feb. 20, 1987.]

In re JOSEPH S. BROOKS on Habeas Corpus.

**COUNSEL**

Denise Moreno Ducheny for Defendant and Appellant and Petitioner.

John K. Van de Kamp, Attorney General, Frederick R. Millar, Jr., Jay M. Bloom, Maxine Cutler and David I. Friedenberg, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

WIENER, J.—Joseph S. Brooks appeals from the judgment entered after he entered a negotiated guilty plea to unlawfully taking a vehicle. The prosecution dismissed a single count of robbery (Pen. Code, § 211)[1] and enhancement allegations. Brooks challenges the denial of motions to withdraw his guilty plea and to dismiss the information pursuant to article III of the Interstate Agreement on Detainers (the IAD), section 1389. We decide Brooks did not waive his right to assert a defense under the IAD. We conclude, however, Brooks's efforts to request a speedy resolution of charges against him did not trigger the statute because no detainer had been lodged with Oregon prison authorities. We therefore affirm the judgment of conviction and deny his petition for writ of habeas corpus.

### FACTUAL AND PROCEDURAL BACKGROUND

The principal issues in this case involve the application of the IAD. Accordingly, we truncate our factual statement in order to focus on the procedural aspects of Brooks's efforts to invoke the IAD. In the discussion which follows, we include some information which was not before the trial court but which has been presented to us in Brooks's motion to dismiss and the judicially noticed documents submitted with Brooks's petition for writ of habeas corpus and the Attorney General's response.

On August 23, 1983, two Los Angeles police officers observed Brooks and a second Black male slumped in the front seat of a stolen silver Isuzu pickup truck in a Hollywood parking lot. The officers arrested Brooks for grand theft auto. In custody, Brooks identified himself as Rahsaam Brown. Brooks later testified he never used the name Rahsaam Brown. The record provides no explanation for the failure to bring Brooks to trial in San Diego following this.

On February 1, 1984, a criminal complaint was filed in San Diego charging Rahsaan Al Brown aka Rahsaam Brown with auto theft and robbery with a deadly weapon enhancement. An arrest warrant for the same person was issued the same day. The real Rahsaam Brown was arrested but later released

---

[1] All statutory references are to the Penal Code unless otherwise specified.

when the prosecutor concluded he was not responsible for the crimes charged. The court recalled the arrest warrant on February 17, 1984.

Meanwhile, the peripatetic Brooks had been arrested on December 23, 1983, in Portland, Oregon under the name Michael Thomas where he was later convicted of theft. The Oregon presentence report dated March 2, 1984, listed Brooks's aliases as Joseph St. Clair Brooks and Rahsaan Al Brown. The report also indicates Brooks's parole agent in Redwood City, California told the Oregon authorities about the armed robbery charges against Brooks in San Diego. Brooks himself learned about the San Diego charges when he saw the Oregon presentence report and talked with his Oregon trial attorney in March 1984. Sometime in March Brooks contacted his California parole agent who confirmed there were charges pending against him in San Diego.

On April 7, 1984, shortly after he was committed to the Oregon State Penitentiary, Brooks asked prison officials to prepare and mail the forms necessary to demand speedy resolution of charges pending in "San Mateo" and "Long Beach." His request stated, "The detainers in Calif. is a parole violation, plus some other charges I know nothing about." In a memo the prison officials informed Brooks to take a copy of his detainer to the prison law library and have the paralegals assist him in filling out the necessary forms. Brooks completed forms for San Mateo and San Diego Counties. He addressed the July 19, 1984, demand to the District Attorney's office in San Diego and listed his name as Joseph St. Clair Brooks aka M. Thomas.

According to Brooks he returned the forms to the prison records officer to be forwarded to California. A statement quoted in the California probation report suggests he mailed the demand directly to the San Diego District Attorney's office by certified mail. There is no evidence the Oregon State Penitentiary authorities completed the certificate required to accompany Brooks's IAD request. The chief records officer later declared the prison did not consider a warrant on an inmate the equivalent of a detainer and did not process a certificate until a detainer was actually lodged with the institution. There is no evidence the San Diego District Attorney actually received Brooks's request.

Sometime between April and November 1984 and after Brooks had been convicted in Oregon, his California parole agent informed the San Diego District Attorney of Brooks's true name and whereabouts. The district attorney obtained a new arrest warrant in the name of Joseph St. Clair Brooks on November 28, 1984, and forwarded a letter of detainer to the Oregon State Penitentiary on December 5, 1984. Using an Oregon State Penitentiary form Brooks mailed a motion to dismiss to the San Diego Municipal Court on January 12, 1985, claiming California had failed to

comply with his IAD demand. Brooks was returned to San Diego in early February 1985.

Following the preliminary hearing the district attorney filed an information on March 12, 1985, charging Brooks with the counts listed in the original complaint. Brooks entered his guilty plea under *People* v. *West* (1970) 3 Cal.3d 595 [91 Cal.Rptr. 385, 477 P.2d 409] on April 10, 1985, the date set for trial. The court continued the sentencing hearing several times to allow defense counsel to secure documents relevant to Brooks's IAD claim. Apparently those documents had been misplaced in Brooks's transfer from Oregon to San Diego. On June 21, 1985, the court ordered documents forwarded from Brooks's property in Vacaville.

Brooks then moved to withdraw his guilty plea and to dismiss all charges on grounds the state had failed to comply with the IAD. The court denied both motions and stated Brooks failed to follow procedural steps requiring that any request be accompanied by the custodian's certificate showing the terms of incarceration. The court also found there was no proof a detainer was ever lodged against Brooks under a name he was known by.

The court sentenced Brooks to prison for the middle term of two years and issued a certificate of probable cause regarding the contested issues. (§ 1237.5.) This appeal ensued. Brooks also seeks habeas corpus relief contending he was denied the effective assistance of counsel when he entered his guilty plea and when he unsuccessfully moved to withdraw his plea and to dismiss the charges. We have consolidated his appeal from the judgment and petition for a writ of habeas corpus.

DISCUSSION

I.

■ We first consider whether Brooks waived his IAD claim by pleading guilty. ■ As a general rule a guilty plea does not constitute a waiver of a violation of the IAD properly asserted before the plea is entered. (*People* v. *Cella* (1981) 114 Cal.App.3d 905, 915, fn. 5 [170 Cal.Rptr. 915]; *People* v. *Reyes* (1979) 98 Cal.App.3d 524, 532 [159 Cal.Rptr. 572].) ■ The problem here is that although Brooks raised the IAD violation before he pleaded guilty, the issue remained unresolved at the time he entered his negotiated guilty plea. The People say Brooks's neglect in failing to reassert his IAD violation before he pleaded guilty amounts to waiver of his rights under the statute. We believe the record supports a contrary conclusion.

In January 1985 Brooks mailed his pro. per. motion to dismiss with prejudice to the court before he was extradited to California. At the conclusion

of his preliminary hearing in February 1985 his appointed counsel requested a copy of the motion from the court file suggesting the document had been received by the court.

Brooks's change of plea form contains no express waiver of his IAD claim. His attorney explained Brooks entered his guilty plea under *People* v. *West, supra,* 3 Cal.3d 595 essentially to expedite the proceedings because the original demand for documents relevant to Brooks's IAD contention had not turned up either through discovery or through files available to him. Brooks believed he lost copies of the documents when transferred from Oregon to California. Brooks did not intend to waive his rights under the IAD.

After Brooks's guilty plea defense counsel continued his efforts to obtain the lost documents. The court continued the sentencing date at least three times to allow time to secure Brooks's papers and on June 21 ordered the forwarding of documents from Brooks's personal property held at Vacaville.

Brooks's intent not to waive his rights under the IAD is reflected in the proceedings of the trial court following the change of plea. The court's cooperative efforts allowing Brooks additional time to obtain the records to support his motion to dismiss are indicative of everyone's belief that Brooks's guilty plea did not foreclose him from arguing dismissal. The prosecution, clearly aware of the reason for continuing Brooks's sentencing hearing, made no objection. Presumably, had the People believed Brooks had waived his IAD argument, they would not have remained silent to permit a continuance for what would have been a useless legal proceeding. In these circumstances we hold Brooks did not waive his IAD challenge.

## II.

The more interesting question in this case is whether Brooks is entitled to the protection of the IAD as a result of his demand for disposition of his criminal charges in San Diego before a formal detainer was lodged against him. As we shall explain, we decide the answer to this question is no. We believe the legislative history of the statute reflects an intent to resolve administrative problems with interstate detainers and accordingly Brooks's IAD rights were not triggered until the formal detainer required by the statute was filed.

Section 1389 codifies an agreement between California, the federal government, 47 other states and the District of Columbia to assist in resolving charges and detainers[2] based on untried indictments, informations

---

[2]The Senate Report on the federal version of the IAD defines a detainer as "a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdicton." (Sen. Rep. No. 1356, 91st Cong., 2d Sess. p. 2 (1970) reprinted in 1970 U.S. Code Cong. & Admin. News 4864, 4865, cited in *United States* v. *Mauro* (1978) 436 U.S. 340, 359 [56 L.Ed.2d 329, 346, 98 S.Ct. 1834].)

or complaints lodged against persons imprisoned in other jurisdictions. (West's Ann. Pen. Code, § 1389 (1986 pocket supp.).) The IAD establishes a procedure by which a prisoner against whom a detainer has been lodged may demand trial within 180 days of a written request for final disposition properly delivered to the prosecutor and appropriate court of the prosecutor's jurisdiction. (§ 1389, art. III, subd. (a).) The failure of the state receiving the request to act in compliance with the IAD and the 180-day limit results in dismissal of the pending criminal charges with prejudice. (§ 1389, art. V, subd. (c); see, e.g., *Marshall* v. *Superior Court* (1986) 183 Cal.App.3d 662 [228 Cal.Rptr. 364].)

Article I of the IAD expressly states the agreement is based on findings that ". . . charges outstanding against a prisoner, detainers based on untried indictments, informations or complaints, and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. . . ." (§ 1389, art. I.) The purpose of the IAD is to encourage expeditious disposition of criminal charges through cooperative procedures among the member jurisdictions. (*Ibid.*; *People* v. *Cella, supra,* 114 Cal.App.3d at p. 916.) Although provisions of the IAD have speedy trial implications, the legislative history shows little concern about speedy trial rights per se. The omission is understandable because at the time the agreement was drafted, the Sixth Amendment right to speedy trial was considered inapplicable to state prison inmates. Although this view has since changed (see *Klopfer* v. *North Carolina* (1967) 386 U.S. 213 [18 L.Ed.2d 1, 87 S.Ct. 988] (Sixth Amend. right to speedy trial applicable to state criminal proceedings); *Smith* v. *Hooey* (1969) 393 U.S. 374 [21 L.Ed.2d 607, 89 S.Ct. 575] (speedy trial right extends to prisoners confined in other jurisdictions)), the problems with detainers correctly or incorrectly were seen solely as being administrative.

The origins of the IAD date back to 1948 when the Joint Committee on Detainers addressed administrative problems arising from the use of detainers. At that time prosecutors were not legally bound to act on detainers at any specific time. It was common practice to lodge a detainer and postpone extradition until completion of the prisoner's sentence in the foreign jurisdiction.[3] Because little information about the underlying charge accompanied the detainer, prison officials did not know whether the detainer was based on an arrest warrant, complaint or "the mere desire on the part of the filing authority to interrogate the inmate." (Yackle, *Taking Stock of Detainer*

---

[3]Those familiar with the detainer process estimate that only half of the detainers lodged against prison inmates are ever acted upon by the requesting authority. (See Note, *Interstate Agreement on Detainers and the Rights It Created* (1985) 18 Akron L.Rev. 691; Yackle, *Taking Stock of Detainer Statutes* (1975) 8 Loyola L.A. L.Rev. 88, 90.)

*Statutes* (1975) 8 Loyola L.A. L.Rev. 88, 90.) These practices created problems for the inmate and prison officials. "... [I]nmates with detainers lodged against them are invariably subject to a more restrictive prison environment. Such inmates are generally classified as maximum-security risks by prison authorities because of the detainee's purportedly increased propensity to escape as a result of the perceived possibility of further incarceration. Accordingly, access to various rehabilitation programs is markedly impaired, if not entirely precluded. Educational opportunities, vocational training, and recreational privileges are consequently curtailed; likewise, eligibility for furlough and parole programs is frequently denied. The existence of a detainer may also adversely affect sentencing procedures, undermining opportunities for sentence commutation, as well as vitiating an inmate's chances for concurrent sentencing should the detainer remain outstanding until his present sentence terminates. Furthermore, psychological disabilities are manifold: indeterminate future imprisonment, as well as anxiety and concern accompanying the more restrictive conditions of confinement, creates motivational problems which needlessly frustrate rehabilitation efforts." (Note, *The Interrelationship Between Habeas Corpus Ad Prosequendum, the Interstate Agreement on Detainers, and the Speedy Trial Act of 1974: United States* v. *Mauro* (1979) 40 U. Pitt. L.Rev. 285, 289-290; fns. omitted.)

Recognizing these problems the Joint Committee on Detainers provided the following guidelines for prosecutors, prison officials and parole authorities: " '1. Every effort should be made to accomplish the disposition of detainers as promptly as possible.

" '2. There should be assurance that any prisoner released to stand trial in another jurisdiction will be returned to the institution from which he was released.

" '3. Prison and parole authorities should take prompt action to settle detainers which have been filed by them.

" '4. No prisoner should be penalized because of a detainer pending against him unless a thorough investigation of the detainer has been made and it has been found valid.

" '5. All jurisdictions should observe the principles of interstate comity in the settlement of detainers, and each should bear its own proper burden of the expenses and effort involved in disposing of the charges and settling detainers.' " (*United States* v. *Mauro* (1978) 436 U.S. 340, 350 [56 L.Ed.2d 329, 340, 98 S.Ct. 1834], citing Bennett, *The Last Full Ounce* (June 1959) 23 Fed. Prob. 20, 22.) The guidelines formed the basis for discussion when

the Joint Committee on Detainers was reconstituted under the auspices of the Council on State Governments in 1956. The council approved a series of legislative proposals which were adopted by the various jurisdictions as the Interstate Agreement on Detainers.

Article IX of the IAD states that the agreement "shall be liberally construed so as to effectuate its purposes." (§ 1389, art. IX.)

■ The legislative history demonstrates that the IAD was drafted to remedy problems associated with long-standing and dormant detainers. Based on this intent we hold that a formal detainer must be filed before an inmate such as Brooks may invoke the provisions of the IAD. Our conclusion is in accord with federal practice (*United States* v. *Mauro, supra,* 436 U.S. 340), the law in other states (see, e.g., *State* v. *Wood* (Iowa 1976) 241 N.W.2d 8; *State* v. *Newman* (1976) 117 R.I. 354 [367 A.2d 200]; *State* v. *Coffman* (1982) 59 Ore.App. 18 [650 P.2d 144]), and the only reported appellate decision to consider the question in this state (*People* v. *Castoe* (1978) 86 Cal.App.3d 484 [150 Cal.Rptr. 237]).

In spite of the unanimity of view on this subject we are frankly uneasy with the foregoing result because of its potential for injustice. Our decision does not require a district attorney in California to promptly handle a request from a defendant incarcerated in another state. A prosecutor motivated solely by a desire to increase a defendant's punishment can circumvent the spirit of the statute by electing not to lodge a detainer after receiving the defendant's request until the inmate's out-of-state sentence is nearly completed. Admittedly a prosecutor may decide to postpone lodging a detainer for legitimate reasons. For example, it may be appropriate to keep the inmate's case on the back burner pending further investigation and consideration as to whether dismissal of the charges is appropriate after the inmate has served a reasonable period of time in the other jurisdiction.

Our concern with potential inequities created by the statute have not escaped notice. Numerous commentators urge amendment to the IAD to require prosecutors to lodge detainers within a certain number of days after the return of the indictment, information, or complaint or after the prosecutor receives knowledge of the accused's whereabouts. (Notes, *Convicts—The Right to a Speedy Trial and the New Detainer Statutes* (1964) 18 Rutgers L.Rev. 828, 860; Dauber, *Reforming the Detainer System: A Case Study* (1971) 7 Crim. L. Bull. 669, 710; Shelton, *Unconstitutional Uncertainty: A Study of the Use of Detainers* (1968) 1 U. Mich. J.L. Ref. (Prospectus) 119, reprinted in Wexler, The Law of Detainers (Oct. 1973).) Other critics advocate elimination of any requirement that a detainer trigger time limits for disposition of underlying charges and propose that prosecutors be required

to pursue all cases within speedy trial guidelines. (Yackle, *Taking Stock of Detainer Statutes, supra,* 8 Loyola L.A. L.Rev., pp. 130-131.)

The fact remains here that no formal detainer was filed with the Oregon State Penitentiary until December 1984. Brooks's earlier demand for speedy disposition of the San Diego charges was ineffective to trigger the IAD.

The concerns which we have expressed for the potential inequities in the application of the statute should not be construed as criticism of the district attorney in this case. This record suggests that Brooks might have been playing fast and loose with the system using a different name when it suited his convenience. Just as the IAD requires each district attorney to act in good faith to effectuate the purpose of the statute, so also must each defendant who seeks the statute's benefits. One obvious requirement is that the defendant must furnish his true name plus other names that may have been used such that the state in which charges are pending can determine whether there is a warrant, complaint or information outstanding. Whether Brooks's use of multiple names here is a bar to his seeking relief is an issue which is not before us. That question will be resolved if he seeks a dismissal of his case on constitutional grounds for lack of speedy trial.

#### DISPOSITION

Judgment affirmed. The petition for writ of habeas corpus is denied.

Kremer, P. J., and Work, J., concurred.